# NEW YORK—FEBRUARY, 1846. 215

The N. Y. Dry Dock Co. v. The American Life Insurance and Trust Co.

THE NEW YORK DRY DOCK COMPANY *v.* THE AMERICAN
LIFE INSURANCE AND TRUST COMPANY and others.

When a person in want of money, applies to a capitalist for his note payable at a
future day ; offering as security, his own obligation, with an indorser or a mort-
gage ; and the respective obligations are executed accordingly ; the transaction
is a loan.

When two persons, who are both desirous to raise money, exchange their own
notes to be used for that purpose with third persons ; it constitutes an exchange
of securities merely. The effect is the same as if each had used his own note,
with the other's indorsement.

A banking company in New York, which had stopped payment, being desirous of
borrowing a large sum of money, applied to a Trust Company usually lending
money in New York, for a loan of their certificates of deposit payable at short
dates, and offered to secure the payment of the amount, by their own obligations
and a mortgage on real estate of sufficient value. The Trust Company agreed
to issue their certificates bearing five per cent. interest, payable in London with-
in two years, for £48,000, sterling, on receiving the bank's promissory notes
for £50,000, sterling, payable in London at the rate of $5 for each £1 ster-
ling, with six per cent. interest, within seven years ; secured by a conveyance
of the real estate to trustees, containing a provision that the bank should pay to
the Trust Company in New York, the respective instalments of the £50,000,
with interest at seven per cent. forty days before each instalment should mature
in London, at the rate of $5, for every £1 sterling. It was understood by the
parties, that the Trust Company would negotiate the bank's obligations in Lon-
don, with their own guaranty, in order to meet their certificates of deposit. The
arrangement was consummated between the parties.

*Held,* 1. That the transaction was a loan by the Trust Company to the bank, and
not an exchange of paper, or a sale.

2. That the reservation of £2000, or four per cent. on the principal sum secured to
be paid, rendered the contract usurious.

The notes of the bank were negotiated in London, to bankers there. *Held,* never-
theless, that the contract was governed by the laws of New York.

Whenever a commission, in addition to legal interest, is charged by the lender, on
discounting a bill or note, or on making advances thereon, unless it be for some
real service distinct from the loan itself, and then be a moderate and reasonable
charge ; it will be referred to the use of the money loaned, and render the trans-
action usurious.

On applying for a loan, the borrower offered to the lender's agent a collateral ad-
vantage, which was likely to be prejudicial to the former, and was certain to be

profitable to the latter. The offer was accepted and the loan was made. *Held,*
that the offer constituted one of the terms and conditions of the loan.

November 12, 13, 14, 15, 1845 ; February 6, 1846.(*a*)

THE bill in this cause was filed September 12, 1842, and as
amended August 2, 1843, stated that the complainants, a corpo-
ration in the city of New York, having banking and other
powers, in July, 1838, being in want of a considerable sum of
money, to enable them to discharge its liabilities and their bank
to resume specie payments, opened a negotiation with Mr. Duer,
the vice president of The American Life Insurance and Trust
Company, a corporation created by the state of Maryland, but
then and still having an office or agency in the city of New
York, and then professing to loan money in that city ; and on
learning that the Trust Company would loan the required
amount, the complainants proposed to secure its payment by
their bonds, secured by real estate in the city of New York,
worth double the amount borrowed.

That after much negotiation, it was finally arranged and
agreed between the complainants and the Trust Company by
its vice president, that the Trust Company should loan to the
complainants two hundred and fifty thousand dollars for a term
of years, upon the following terms and conditions, viz : The
complainants should give their bills of credit or bonds, as they
were called, for fifty thousand pounds sterling, payable in Lon-
don to the order of Mr. Duer, bearing interest at six per
cent. per annum, payable half-yearly, on the fifteenth days
of July and January, until paid, and calculated at five dollars
to the pound sterling ; £10,000 being payable July 15, 1842 ;
£10,000, July 15, 1843 ; £10,000, July 15, 1844 ; and £20,000,
July 15, 1845 ; and that the same should be chargeable upon
and secured by the complainants' real estate in the city of New
York, worth double the amount. And further, that the com-

---

(*a*) The reporter has been induced by the frequent occurrence of defences on
the ground of usury, the importance of the questions discussed in this case, and the
magnitude of the interests involved ; to deviate from his usual practice, and insert
in full the arguments of the counsel on the principal points.

plainants, instead of actually paying its bills of credit or bonds in London, and the interest thereon at six per cent., should pay the bills of credit or bonds to the Trust Company in New York, at the rate of five dollars to the pound sterling, and interest thereupon at seven per cent. half-yearly, and to make such payments at least forty days previous to the time when the same should fall due in London. The complainants being in effect required to pay $250,000 to the Trust Company, at seven per cent. interest, half-yearly, in New York, at least forty days before the times interest and principal were payable in London. And in addition to, and forming a part of the terms of the loan from the Trust Company, the complainants were to allow a deduction of one per cent. on the nominal amount of $250,000; which as represented, was to enure to the private benefit of Mr. Duer, and to be paid to him upon the consummation of the agreement. And also in addition to, and forming a part of the terms of the loan, it was agreed that the complainants should guaranty to Mr. Duer, that upon such consummation, (by which they would be enabled to resume specie payments,) he might and could purchase in the market, one thousand shares of their capital stock, at seventy per cent. on its par value; that being the reduced value of the stock at the time of making the contract; the object and intention of the guaranty, being to secure to Mr. Duer the advantage of purchasing the stock at the then price, in case the contract were carried out and their resumption of specie payments should increase the market value of the stock; and to secure him against the rise of the stock, which the purchase of so large an amount might create in the market. Which guaranty, the parties then justly estimated might produce a loss to the complainants exceeding five thousand dollars, and a profit to Mr. Duer of ten thousand dollars.

That the Trust Company, instead of actually loaning to the complainants upon the securities, the sum of two hundred and fifty thousand dollars, the nominal amount was agreed to be further reduced four per cent., and then instead of money, that the complainants should take and accept, in lieu thereof, certain certificates or obligations, made and given by the Trust Company, to the amount of twenty-four thousand pounds, adding

thereto an interest of five per cent. per annum, and made payable in London, (as stated in the certificates,) part payable 15th July, 1839, and the remainder 1st October, 1839, and twenty-four thousand pounds, bearing an interest of five per cent. per annum, payable in London, in two years from the fifteenth day of July, 1838 ; such certificates issued in different sums, but generally for about the sum of five hundred pounds sterling.

That the gross nominal amount of the certificates agreed to be taken in lieu of the money, was forty-eight thousand pounds sterling, or allowing five dollars to the pound, the same amounted to two hundred and forty thousand dollars ; and that the value of the certificates in market at the time of the contract, well known to both parties, did not exceed ninety per cent. of the nominal amount of the same, and could, under no circumstances, be made to produce more than $228,000, out of their nominal amount of $240,000, from which product was to be taken the two thousand five hundred dollars, allowed to Mr. Duer, for commissions, and five thousand dollars for the guaranty of the stock, as before stated, and the amount of proceeds would be reduced to about $220,000. An extract from the books of the complainants was annexed to the bill, showing the amounts, dates, and minute particulars of the transaction.

The bill further stated, that the moneys designed to be realized and actually agreed to be loaned to the complainants by the Trust Company, after deducting the sum required by, and represented to be for Mr. Duer, did not exceed the sum of $220,000, and for which the Trust Company and Mr. Duer, the vice president thereof, as such, and as represented, on his own account, required the complainants, as the security for such proceeds of $220,000, and with the usurious intent of obtaining more than seven per cent. per annum for the loan of the money to the amount of such proceeds, to give their bills of credit or bonds, for the gross amount of fifty thousand pounds sterling, equal to $250,000, secured by real estate, worth double the value thereof.

That with a view of more securely avoiding the appearance of usury, it was further agreed by the Trust Company and the complainants, and executed by Mr. Duer the vice president, that instead of giving a mortgage in form, as the collateral security

to the Trust Company, a deed in trust of the real estate should be made by the complainants, conveying the same to Mr. Duer, and Morris Robinson, and Abraham Crist, for the purpose of securing the payment of the bills of credit or bonds.

That in consummation of the usurious agreement, the complainants executed and delivered to the Trust Company, their bills of credit or bonds, as they were called, according to the terms of the agreement as before stated. And they also duly executed and delivered an indenture tripartite, between the complainants of the first part, and the Trust Company of the second part, and Morris Robinson, John Duer, and Abraham Crist, of the third part, dated the 24th day of July, 1838, and which deed or indenture was duly executed by the respective parties thereto. The indenture recited that the complainants had determined to issue their sterling bills of credit, for fifty thousand pounds sterling, payable in London, at the times and in the manner before stated ; the payment of such bills of credit, being specially charged on the real estate of the complainants' therein mentioned. And the indenture also recited, that The American Life Insurance and Trust Company had agreed to guaranty the payment of such bills of credit and interest, as they should respectively fall due and become payable. And it was also recited, that it had been understood, and was thereby agreed, that the Trust Company should pay the bills of credit and the interest thereon, in London, as they should respectively fall due and become payable, without any charge for remittance, difference of exchange, commission, or otherwise, the complainants agreeing to pay the Trust Company the interest upon the bills of credit, at the rate of seven per cent. per annum, half-yearly, valuing each pound sterling of the principal at the rate of five dollars, at least forty days previous to the time when the same should fall due and become payable in London ; and also agreeing to pay to the Trust Company the amount of the bills of credit, at the rate of five dollars for each pound sterling, at least forty days previous to the time the same should respectively fall due, and become payable in London. And further, the complainants, by the indenture tripartite, as therein stated, for the purpose of securing the payment of the bills of credit, and the interest, before mentioned, and in

220 CASES IN CHANCERY.

The N. Y. Dry Dock Co. v. The American Life Insurance and Trust Co.

consideration of the sum of one dollar, to them in hand paid by the party of the third part, granted, bargained, aliened, released, conveyed and confirmed to the parties of the third part, and to the survivor or survivors of them, all the several pieces and parcels of land, set forth and described in such indenture tripartite, situate on and near the East River, between Sixth and Eleventh streets, in the Eleventh Ward of the city of New York—to have and to hold the premises, so therein described, to the parties of the third part, and to the survivor or survivors of them, in trust, for the purpose of satisfying the bills of credit, and interest thereon, and upon the following condition, viz : In case the complainants should fail to pay to the Trust Company the bills of credit, before mentioned, or the principal thereof, in the manner before stated, then it should be lawful for the parties of the third part, and the survivor or survivors of them, and it was made their duty, either to lease, mortgage or sell the premises, or any part thereof, and out of the avails thereof, to pay the Trust Company the interest upon the bills of credit, and the principal, in the manner before mentioned. And upon the further trust, that in case the Trust Company should at any time thereafter, fail to pay the interest upon the bills of credit, or the principal in London, as the same should severally fall due and become payable, then it should be lawful for the complainants to pay the bills of credit, and the interest thereon as stated, to the parties of the third part, or to the survivor or survivors of them, who should then provide for the payment of the same, with the interest thereon, as the same became due ; and in case the complainants and the Trust Company should both fail to pay the bills of credit, and the interest thereon, in manner and form, as was therein before stated, respectively to be done, then it should be lawful for the parties of the third part, and the survivor or survivors of them, and it was made their duty, to lease, mortgage or sell the premises, or any part thereof, and out of the avails to pay the bills of credit, and the interest thereon, as they severally became due and payable. And it was also mutually understood and agreed, that in the execution of the trusts created by the deed, the parties of the third part, should be entitled to receive and

reimburse themselves all costs and charges in the premises, and retain reasonable compensation for their services.

The bill further stated that James Morrison of the city of London, was the holder of the bills of credit, or bonds so given by the complainants, to £47,800 sterling, or thereabouts, and that the residue of £2200 sterling, was in the hands of some person or persons in London or elsewhere, in foreign parts, wholly unknown to the complainants. That the premises described in the deed of trust, were at the date of the same, of the value, and well worth five hundred thousand dollars, and were free of all incumbrances, and that no other consideration whatever, was received by the complainants, or moved from the other parties thereto, than the usurious consideration before set forth.

That the certificates were in pursuance of the contract, received by the complainants from the Trust Company, amounting in the whole to the nominal sum of £48,000 sterling, or $240,000, at five dollars to the pound sterling, and which was the only amount, and the only manner in which the $250,000 was loaned to the complainants by the Trust Company ; and Mr. Duer, when so delivering the certificates, took and retained one of them amounting to £500, or $2500, as and for the one per cent. for his commissions, in pursuance of the contract, of which the Trust Company had notice, and the same was also well known to Messrs. Robinson and Crist, the other trustees. That the $240,000, of certificates, were not worth in market, (and so all the parties knew,) exceeding $228,000, and deducting the $2500, paid to Mr. Duer, not worth much over $225,000. That the complainants actually paid in addition, a loss of over $5000, on the guaranty of the one thousand shares of their stock, to Mr. Duer, at the rate of seventy per cent. upon the par value thereof ; and they charge, that in fact, the proceeds of the certificates, after making the deductions specified, did not equal $220,000 ; and this result was certain, and well known to all the parties at the time of contracting the loan, and which was usuriously exacted on the one side, and yielded to on the part of the complainants upon the other side, as the only means of obtaining the loan from the Trust Company.

The bill further charged that the bills of credit or bonds, so

given by the complainants, and the deed of trust, so given to se-
cure the payment of the same, were so given upon the usurious
contract before stated, and upon no other consideration whatever;
and that the contract was, and is, usurious and void; and that
the said certificates or bonds, and the deed of trust being founded
upon such usurious agreement, in violation of the statute regu-
lating the interest of money, are void.

That the Trust company threaten to proceed and collect, and
enforce payment of the interest and principal, due and growing
due upon the usurious agreement stated in the bill, by requiring
the trustees to take possession of the premises conveyed to them,
requiring the tenants of the complainants to attorn to and pay
the rents to them. And that the trustees have actually issued
and caused to be delivered to the complainants' tenants, notices
of the trust deed, and of their title to the rents, and forbidding
the tenants to pay the same to the complainants, and requiring
payment to be made to the trustees. Which notices were dated
April 26, 1842.

That the trustees intend to assume the direction and control
of the complainants' property, conveyed to them in trust, and con-
tinue to interfere with and embarrass the complainants in the en-
joyment of their property, and the rents and profits thereof, and
by their threats and interference, produce irreparable injury to
the complainants.

The bill prayed that the conveyance in trust, and bills of cre-
dit or bonds might be declared void, and that the same be deliv-
ered up and cancelled, and that the trustees might release to the
complainants the premises conveyed to them, and that the Trust
Company, and the trustees, and James Morrison, might be res-
trained from commencing or prosecuting any suit or proceeding
whatever, to obtain the premises described in the conveyance in
trust, or the possession thereof, and from collecting and receiving
the rents of the premises, and from meddling, or interfering
with the said premises, or any tenants thereof, and from hinder-
ing or interfering with the complainants in the enjoyment of the
premises, or the collection of the rents of the same; and for gen-
eral relief.

The American Life Insurance and Trust Company, John

Duer and Morris Robinson, united in an answer to the bill, in which they set forth, that the complainants applied in March or April, 1838, to the Trust Company, through Mr. Duer, to aid their bank in resuming specie payment. The negotiation was carried on several weeks, and on the 9th of May resulted in an agreement, by which the complainants were to issue their bills of credit for £50,000 sterling, as stated in the bill, and pay them in New York as also stated ; the Trust Company were to guaranty the payment of such bills of credit and interest, were to take upon themselves all the risks of remittances, fluctuations of exchange, and all other risks attending the transmission of the funds ; and in order to cover and protect the Trust Company from their responsibility in the guaranty of the bills of credit and their assumption of such risks, and as a commission and compensation for their trouble in the agency, and as a protection to those who might become purchasers or holders of the bills of credit ; the complainants were to secure the payment of the same by a mortgage or pledge of their real estate ; and the pound sterling was to be calculated at five dollars. It was further agreed that the Trust Company should purchase the bills of credit, and in payment, should issue to the complainants, the certificates of deposit of the Trust Company, for £48,000 [sterling, with such interest and redeemable at the time stated in the bill. And the £2000 sterling difference between the bills of credit and the certificates of deposit, was a part of the consideration of the extraordinary risks assumed by the Trust Company in remitting nearly $500,000, from New York to London, exclusive of the half yearly remittances of interest ; which risk embraced not only the solvency of drawers of bills, by which the funds were to be remitted, but the rate of exchange at the several times when made, the solvency and fidelity of agents in London, and the other hazards attendant upon a transaction of such magnitude and duration.

The answer further stated, that the price of the certificates or of the bills of credit, entered in no way into the transaction, as it was but an exchange of securities. That the sterling certificates of the Trust Company, were not made for the New York market, or ever sold there ; but similar certificates of theirs were

at that time selling at par in London. The agreement as stated, was consummated by the issue of the certificates on the one hand, and the bills of credit on the other, with the deed of trust set forth in the bill; and this was the whole agreement between the parties. The answer denied that any stipulation for an allowance or deduction of one per cent. to Mr. Duer, or for a transfer of stock of the complainants, formed any part of the negotiation or agreement, or entered into the same directly or indirectly. The title to the complainants property conveyed as security, was derived from various sources; the examination of the titles was long, laborious and unusually complex ; and for this service, his opinion on the titles, preparing the securities, and the responsibility incurred by him therein, the complainants paid to Mr. Duer, who was the counsel of the Trust Company, one of the latter's certificates of deposit, for £500, as a counsel fee. That Mr Duer frequently fixed one per cent. for his counsel fee in small transactions, and in all it made a fair proportion, having reference to the transaction, the labor and the responsibility. The fee was not paid to him as an officer of the Trust Company, and formed no part of the contract with them. The party for whose benefit the titles were examined, always paid their counsel, and the complainants well understood this custom.

The answer denied the arrangement or contract, stated in the bill, as to guaranteeing to Mr. Duer the purchase of the complainants' stock. It set forth that during the negotiation, or after its conclusion, the complainants' president, Mr. Holmes, offered to sell to Mr. Duer one thousand shares of such stock, at seventy-five per cent., which was then above the market price, and upon consulting some friends, he agreed to accept it. He believed it belonged to Holmes, or to him with other directors of the complainants' bank. When Mr. Duer, about the 8th of June, 1838, requested Holmes to transfer the stock, he was told that Russell Stebbins, another director, from whom Holmes said he expected the shares, would not transfer them without receiving their par value, and that the difference must be provided for in some way. Thereupon Mr. Duer paid to Stebbins' firm $30,000, being the par value of the thousand shares, and the difference between that and the price agreed upon, was paid by Holmes in a post

note of the complainants for $7334 37, with interest; which note was given to the Trust Company, who had advanced the money for purchasing the stock. Mr. Duer did not know or understand how Holmes obtained the post note, nor whether its payment would be a loss to the complainants. The answer denied that the Trust Company had any concern or interest in the same; or that the complainants had, to the defendant's knowledge or information. One half of this stock was transferred to three persons, who were directors in the Trust Company, and became directors in the complainants' bank; Mr. Duer retained four hundred shares, and one hundred went to another person connected with the Trust Company.

The answer denied that any loan was agreed to be made by the Trust Company to the complainants, or was made, or any other negotiation entered into than that set forth in the answer. And it denied that the agreement was corrupt and usurious, in the intention of the parties, or in contemplation of law. The trust deed was adopted as a convenient and appropriate form, and for no other purpose. The premises conveyed, were at the time estimated to be worth $500,000, but they have greatly declined in value, and it was doubtful whether they were a sufficient security for the $250,000. The answer further stated, that the bills of credit issued by the complainants, were transmitted to London for sale, with the Trust Company's guaranty, and £2200 sterling, were sold from October, 1838, to December, 1839, producing £2146 10s. 6d. sterling, net to the Trust Company. The price became so low, that further sales were deemed inexpedient, and in January, 1840, the whole residue, £47,800, was conveyed and assigned to James Morrison, of London, as security for £44,500 sterling, advanced by him to the Trust Company on their bonds and the bills of credit. The Trust Company has paid to the holders of the same, £4000 sterling of the interest which has accrued thereon since January 15th, 1841, no part of which interest has been paid by the complainants. The answer denied that the result of the sale of the certificates of deposit by the latter, was certain and well known to the parties when they contracted; or that there was any thing usuri-

ously exacted on the one side, and yielded to on the other, in the arrangement.

The trustees acted in discharge of their duty, in proceeding to control the possession and the rents of the property conveyed to them.

The answer of James Morrison, did not differ essentially from that of the other defendants, except that he had no knowledge or information as to the consideration on which the complainants executed their bills of credit, and the conveyance in trust. It stated that he was the holder of one hundred and thirty-three of those bills, amounting to £47,800 sterling, which he received, believing them to be valid and available securities, and upon sufficient and lawful consideration. That he took the same in the usual course of business, for a valuable consideration, before they were due, and is entitled to payment thereof, and to the security of the premises conveyed in trust. In January, 1840, the American Trust Company owed to him £45,288 13s. 9d. sterling, for which he then held those bills of credit as a security. The company paid to him £5000, and assigned to him £44,500 of the bills of credit, in discharge, when paid, of £40,118 16s. 7d., which he accepted as the balance of such debt. The company was then able to pay him, and he would have enforced payment in cash, if he had not relied in full faith on the bills of credit so transferred.

The answer of Abraham Crist, was of a neutral character. He was the solicitor and counsel of the complainants when the trust deed was executed ; but had ceased to act in that capacity.

Replications to the respective answers were filed, and testimony taken on both sides.

Obadiah Holmes, on the part of the complainants, testified that he was one of their directors in 1838, when the bank, after applying in vain to the city banks for aid, attempted to obtain a loan in order to liquidate the demands against them, and thus take their property out of the hands of a receiver, and dissolve an injunction then outstanding against them. He was afterwards their president. The directors appointed the witness with R. Stebbins and E. D. Comstock, a committee to effect such loan. The witness called on Mr. Duer, the vice president of the Ameri-

can Trust Company, and opened to him the subject of a loan. It resulted in the complainants procuring a loan from them of $250,000, in their certificates of deposit for £48,000, payable in London, for which the former gave their bonds for $250,000, payable in London, secured by the deed of trust. In the course of the conversation with Mr. Duer, the witness told him that the complainants had, as he supposed, the control of one thousand shares of their stock, which the committee would sell to him and his friends, at a little below the then market price, and would permit them to nominate directors in the complainants' institution. Mr. D. then remarked, that he should require one per cent., for himself individually, and for commissions, counsel fees, &c.; all of which was acquiesced in by both parties, and finally consummated. The witness stated to Mr. D., that the market price of the stock was greatly below its intrinsic value, particularly after a loan should be made; and so it proved, as the stock went up to par soon after the loan was made. Mr. D. did not make it a condition, that the stock should be furnished, but the committee felt obligated to furnish it after the loan was made. The witness's object, was to get him interested in the complainants' corporation, so that he might make money and facilitate the committee's arrangement for the benefit of the two companies. The witness remonstrated with Mr. D., in regard to the allowance of four per cent. discount on the loan, and offered two and one-half per cent.: but he insisted on the four per cent., in consideration of the Trust Company's indorsing and becoming liable on the complainants' bonds. Time was taken by the witness for consultation with the others of the committee and the directors. The others objected particularly to the arrangement relative to the thousand shares of stock, but on reflection, they ultimately conceded it. (The witness then stated the consummation of the agreement, as it appeared in the pleadings.) The property conveyed was valued by sworn appraisers at a little over $500,000. The witness believed he could realize in London, either par, or within one or two per cent. of it, on the Trust Company's certificates. He knew a house where he could probably get the money for them, when he commenced negotiating; and Mr. D. concurred with him in that belief. Mr. D. went

with the witness to that house to ascertain, and on the object being explained, they were assured that an advance of ninety per cent. would be made, and the certificates forwarded by the house to London for sale. The same house subsequently made advances on them accordingly. The loss sustained by the bank on the certificates was about $20,000. On receiving the balance of the certificates, the witness handed to Mr. D. one of £500, in accordance with their agreement. The complainants caused a thousand shares of the stock to be purchased and delivered to Mr. D., he paying for it according to the understanding, which was about 74 or 75 per cent. This quantity of stock was hypothecated to the complainants, and the committee supposed the parties interested would let it go at its then market price, about 75 per cent. ; but while negotiating for it, the stock advanced nearly to par, the parties declined to let it go, and the complainants had to buy it in market as well as they could. They had to pay over $7000 more for it, than the price agreed with Mr. D. It was the understanding that Mr. D. was to examine the title and prepare the writings, but Mr. Crist, as the witness believed, performed those services.

On his cross examination, the witness stated that the injunction and receiver had been on the complainants about a year, and were in the first instance obtained on the application of their directors. They did not sell off the real estate, because of the great commercial depression, which they thought would cause a sacrifice.

When the witness first applied to Mr. D., he did not suppose the Trust Company had the money to loan to such an extent as he wanted. He proposed to deposit securities with the Trust Company, and a mortgage on the real estate, upon which the latter should issue their certificates of deposit. Mr. D. proposed the sterling bonds payable in London, and the deed of trust. It was the second or third interview, when he said he should expect one per cent., at the same time and after the terms of the loan were mainly agreed upon. It was a charge for himself as a counsel fee, and for his trouble in carrying out the affair. One of the committee proposed to him at the first interview, the sale to him of the thousand shares of stock. This was intended for his private benefit, and the witness did not then suppose the loss

would be much to the complainants. It was offered to him at three or four per cent. below its market price. The loss to them was occasioned by the rise in value, and their being unable to control the stock as before mentioned. The committee when they proposed this, did not suppose the securities they were to give would be illegal or invalid. Mr. D. proposed that their bills of credit should be guarantied by the Trust Company, to which they made no objection.

The witness had learned from London, and so told Mr. D. during the negotiation, that the certificates would not bring quite par there. Since June, 1838, when the bank resumed payment, to November, 1844, exchange on London has ranged in New York from five to ten and a half per cent.

Russell Stebbins, a witness for the complainants, testified that he was a director from January, 1830, till April, 1845, and their president from February, 1841, to January, 1845.

That the committee to negotiate a loan of $250,000, to $300,000, was appointed by the board of directors on the 9th of May, 1838, and he produced a copy of the minutes of the board on that occasion. Mr. Holmes conducted the negotiation and reported to the others, when witness went with him to Mr. Duer. The witness objected to Mr. D., to the rate of four per cent. charged on the loan, to the one per cent. commission and to the thousand shares of stock, and as to the latter told him the complainants had no right to sell it in that way. Mr. D. stated that he could not or would not take less, and intimated by his manner, and as witness believed by words, that if they did not choose to take it, there was no harm done. Mr. Holmes and the witness then left, but they acceded to the terms.

(These were stated substantially as by Holmes; except that this witness understood the stock was to be furnished at its then current rate, between 70 and 75 per cent.)

The loss on the stock was adjusted thus: The Trust Company furnished the $30,000, which was necessary to buy it, and then a due bill of the committee payable to that company, was given to Mr. Duer, for the difference between that sum and the price at which he was to have the stock furnished. The due bill was dated June 8th, 1838, and it was afterwards withdrawn

and a post note of the complainants substituted, dated November 20, 1838, for $7847 87, which included a year's interest. The receipt at the foot of the due bill, was given by the secretary of the Trust Company. The market price of the stock of the Dry Dock Company was 73 per cent. on the 21st of April, 1838, 73 to 73½ on the 12th of May, 74 on the 15th of May, 78 on the 17th, 80 to 81 on the 18th of May ; and from thence it continued advancing till the 6th of June, when it sold for 97, on the 7th at 99, and on the 8th of June, at par. Mr. Crist examined the title of the lands conveyed, and prepared the abstract, for which the complainants paid him $200. He also drew the trust deed, for which they paid him $50.

On his cross examination, the witness stated that he was a large stock-holder in the Dry Dock Bank, when it suspended, and when it prepared to resume specie payment. When the complainants made their application, it was in contemplation to obtain money, to pay off their debts ; yet they wanted to obtain credit, and were willing to pledge their property, to raise the means to pay their debts. The last sale of their stock in market prior to April, 1838, was on the 10th of January, at 70 per cent. The thousand shares of stock, were intended for the private benefit of Mr. Duer, but it was a part of the general arrangement, as the witness understood it. It was understood by both parties, that the certificates of deposit were to be sent to London, for negotiation, but the witness did not know that the bonds of the complainants were positively to be sent there. Mr. Duer was counsel for the Trust Company, in respect of the abstracts of title and the trust deed.

On the part of the defendants, Mr. Duer was examined as a witness, and testified in substance to the facts set forth in the answer of the American Life Insurance and Trust Company. He also stated that the negotiation was commenced by Mr. Holmes the last of March, 1838, and he first applied to ascertain on what terms the Trust Company would guaranty the Dry Dock Bank's bills, of credit and negotiate them in London. This could not be done, and it was then proposed that the Trust Company should become the purchasers of the bills of credit to be issued by the bank, by exchanging therefor their own securities,

and should assume upon themselves the payment in London of the bank's bills of credit, and the payment of the latter by the bank, to be secured by a conveyance in trust of the real estate of the bank. A long time was consumed in the settlement of the details of the proposition. There was no proposition at any time, for a loan of money by the Trust Company to the complainants. It was well known by the parties, that the former could not have advanced the amount required in cash. The complainants knew that the Trust Company intended to sell their bills of credit. Hence those were made payable in London ; and the certificates of deposit were made payable there, because the complainants expected to raise funds there on the credit of the Trust Company. The provision for their paying five dollars in New York, for every pound sterling, forty days before the time of payment in London, was upon the consideration that the Trust Company guaranteed and undertook to pay absolutely in London, the complainants bills of credit. Such payment was to be provided for either in funds there with an agent, or a sufficient credit to meet it. To provide funds, bills of exchange were to be purchased and remitted. The agent would receive a commission for his services, and the Trust Company risked his solvency and honesty, as well as the goodness of the bills of exchange used for remittance, and the chance of an advance in the price of exchange. The rate of five dollars to the pound, was fixed upon as a part of the compensation for these risks and expenses. The difference of £2000, between the amount of the certificates and the bills of credit, was intended as a compensation to the Trust Company for the services they were to perform, and the risks they undertook, in the transaction.

The bills of credit were all indorsed with an absolute guaranty of payment of both interest and principal, by the Trust Company.

The proposition for the sale of one thousand shares of stock, was made to the witness individually ; and as he understood it, the stock was owned by Mr. Holmes and others, in their own right. The price was slightly above the market when it was offered.

The price was seventy per cent. at which the stock was agreed to be sold. When the bargain was consummated, the witness agreed to give several per cent. more than the price at which it

was offered; and did give something more than 75 per cent. There was no condition or stipulation about this stock in the agreement between the two corporations. It was a private matter, resting upon the honor of Mr. Holmes and those for whom he acted. The allowance of one per cent. to the witness, was paid to him as a counsel fee for examining and certifying the title to the lands conveyed in trust, and settling the form of the securities that were to be executed. The Trust Company had no interest in the allowance, and derived no benefit from it; and it was not made a condition of the loan. The witness examined the abstracts of the titles, the searches, and when necessary the original deeds. The investigation was very laborious, and some weeks elapsed before it was completed.

James G. King, for the defendants, testified that he had been a banker for twenty years, as a member of the firm of Prime, Ward & King, and was conversant with dealings in exchange between the United States and London. When employed by a principal in New York, to make a remittance to London by bills of exchange, and a payment to his creditor there, the charges would be—for purchasing the bills, one-fourth of one per cent., for making the remittance under guaranty, which including purchasing, one per cent., banker's commission in London, half of one per cent., and the interest or discount in London, as might be agreed upon. The English sovereign in 1838, represented the pound sterling, and was by law a legal tender in the United States, at four dollars and eighty-seven cents. The charges on remitting in sovereigns from New York to England are; for purchasing, shipping, and effecting insurance, a commission of one per cent.; freight, three-eighths to one-half of one per cent.; insurance, one-half of one per cent.; receiving in London, converting and paying, a commission of one per cent. These commissions, in a continuous course of reciprocal business, are now usually reduced one-half. In order to give five dollars to the pound sterling, the rate of exchange would be twelve and one-half per cent. premium, without any commissions, for sixty day bills, which is the usual time after sight, at which bills remitted to England are drawn. The market price of sovereigns in

The N. Y. Dry Dock Co. v. The American Life Insurance and Trust Co.

New York is generally a little higher than the value as fixed by law ; the difference sometimes rises to a half per cent.

Samuel Jaudon, for the defendants, testified that he was conversant with dealings in exchange between England and the United States for twelve years ; first while cashier of the Bank of the United States, for four years as a banker in London, and since in New York.   The ordinary commission for purchasing and forwarding bills of exchange, is one-half of one per cent., including the correspondence ; for guaranty or indorsing the bills, one per cent. ; the banker's commission in London, for paying interest or dividends in small sums, is one per cent.   The discount on the bills remitted, depends on the time they have to run, and the state of the money market.   The rate varies from two and one-half per cent. to six per cent. per annum.   The sovereign in 1838, was of the value of four dollars, eighty-six cents, and one-tenth of a cent., according to the mint assay in the United States.   To remit to England and pay in sovereigns, the charges would ordinarily be three per cent., viz : bullion broker for purchasing and packing, one quarter of one per cent. ; insurance and shipping charges, about three-fourths of one per cent. ; freight ordinarily, one-half of one per cent. ; commission here, the same ; commission in London, one per cent.   The charges on remitting and paying interest in small sums, on a large number of notes in London, if put in funds in New York forty days before due there, including discount on the bills remitted, would ordinarily be three per cent. ; to which the market price of the bills should be added.   The legal par of exchange between England and the United States, according to the laws of the latter, is nine and a half per cent.   The three per cent. charges added, would make exactly five dollars to the pound sterling, that the remittance would cost.   The legal rate of the pound sterling, has been altered since 1838, making it worth a little less than it was then.   To remit in sovereigns and pay in London, being furnished here forty days before due there, the witness would require here five dollars, and six mills and 83–100ths of a mill.

James Brown, for the defendants, testified that he had been engaged about twenty years in buying and selling foreign exchange.   His firm in New York is Brown, Brothers & Co.   For

remitting to London in bills of exchange, assuming the risk, and paying over there in dividends on notes varying from £100 to £800, and amounting to near £50,000 ; engaging in 1838 to do this ; the charges would be, for purchasing, one-half to one per cent., probably half per cent., the amount being large ; for remitting and guarantying, one per cent. ; commission in London, one per cent. ; discount at the rate of five per cent. per annum. The reduction in the value of the sovereign since 1838, has been about one-fourth of one per cent. To remit in sovereigns and pay dividends as before mentioned, the charges would be, for purchasing and remitting, including brokerage, one per cent., if in sums of $5000 at a time ; if $10,000 or more, three-quarters of one per cent. ; freight, one-quarter to three-eighths ; insurance one-half of one per cent. ; paying in London, one per cent. ; and then the shipping charges, which would be a mere trifle on coin. The charge for accepting or indorsing paper at six months, without funds in hand, but with sufficient security, would be about two and one-half per cent. by those engaged in such business. To make a payment in London of £1000, due in forty days, on being furnished with specie funds here, the witness would charge from three and one half to three and three-fourths per cent. Stated separately, the cost of remitting and paying by bills, and by sovereigns is thus : By sovereigns, one-fourth to one-half per cent. premium for the coin, one-half to three-fourths for purchasing, one per cent. commission in London, one-fourth to three-eighths for freight, one-half to three-fourths for insurance ; making from two and one-half to three and three-eighths per cent. By bills of exchange, one-half to three-fourths for purchasing, one per cent. for guaranty and remitting, commission in London one per cent., discount for the sixty-three days, 83–100ths per cent. ; making from three 33–100ths to three 58–100ths per cent.

George Griswold, for the defendants, testified that he has been engaged in foreign commerce thirty-five years, and a portion of his business has been that of remitting and drawing on London. The ordinary charges for remitting in bills and paying dividends in London, in the manner before mentioned, are, for buying, one-fourth of one per cent. ; for remitting and guarantying, one per

cent.; for paying over in London, one-half to one per cent.; and to cash the bills in London, interest at five per cent. per annum. For a like operation in sovereigns, the charges would be, for brokerage in buying, one-half per cent.; one-half to three-fourths for insurance, depending on its being in summer or winter; freight, three-eighths to one-half; commission in London, one-half to one per cent.; and sundry petty charges for shipping and discharging. For accepting or indorsing negotiable bills at six months, without funds in hand, but with sufficient security for ultimate reimbursement, the usual charge would be two and one-half per cent.

The defendants, also read in evidence the act of the legislature of Maryland, incorporating the American Life Insurance and Trust Company, and the several acts amending and consolidating the same.

*S. Sherwood,* for the complainants.

I. The transaction set forth in the bill of complaint and admitted by the answers, originated in the application by the New York Dry Dock Company, to the American Life Insurance and Trust Company, for a loan. The form was devised by the latter, for the purpose of securing to themselves a greater profit than seven per cent. per annum, for the money which they should advance or pay to the complainants.

The whole object of the complainants was to obtain money, nothing short of which would enable them to resume. The certificates of deposit were received by them as cash. There was clearly a loan on one side, and a giving of security on the other. And the result of this gross usury, showing a loss to the complainants up to July, 1845, of $63,563 73, beyond legal interest, awakened the concern of the stockholders, and induced them to come into this court, to settle the equities of the case, upon the law of the land. The answer seeks to justify it, first as a purchase, next as an exchange of securities, and lastly as to the deduction of four per cent., on the ground of the guaranty.

1. It was not a purchase. By their charter, the Trust Company could not guaranty, except bills and notes which they had previ-

ously discounted or purchased, and which they then held. So a purchase in this case will not stand with the guaranty, provided for in the same contract. And the complainants could not sell their own bills of credit.

2. It was not an exchange of paper. That consists simply of passing the paper of the one to the other, without any other consideration. This was unlawful on the part of the complainants. (1 R. S. 589, § 1, subd. 7.)

3. It was not justifiable as a guaranty, because the Trust Company's charter prohibited it in such a case.

4. It was simply a *loan*. The complainants who were bound to resume specie payment, or lose their charter, applied to the Trust Company, who kept an office for the ostensible purpose of loaning money, explained its necessity and their situation and wants ; asked for a loan of money, and offered improved real estate as the security. They applied there, because there only such large sums as $250,000, or $300,000, were to be had. They did not ask for an exchange of paper, or a guaranty, or for a purchase of their obligations. The Trust Company devised the form of the transaction, and pointed out how their certificates would produce the money. They all treated it as a loan, and so called it, and Mr. Duer does so still, except when placed on his guard and made to discriminate.

III. The contract between the parties, actually reserved a greater premium to the American Life Insurance and Trust Company, than seven per cent. per annum, and is therefore void.

1st. The 4 per cent. discount made upon the bonds or bills of credit of the complainants, on the giving of certificates of deposit at the rate of £96, for £100, was usurious and made the contract void.

This is excused by the extraordinary risk and hazard of transmitting the moneys to Great Britain, and disbursing them there. As to this excuse, the complainants were to pay in New York, and the contract was in every respect to be performed here. There was no risk or hazard about it. The Trust Company were to advance their money, (or their certificates, which is no worse for them,) to a solvent bank, in which their directors wanted and took stock, on abundant real estate security ; and the four

per cent. was simply for advancing the money. It is said the certificates were payable abroad on time, but it was by paying here five dollars for every pound sterling, which covered remittance, commissions and all charges; and would enable them to remit in coin, covered by insurance.    The $5, for £1, made the transaction equal to cash in London.

2d. The difference charged between the rate of five per cent. interest, on the Trust Company's certificates of deposit, and the seven per cent. interest, required to be paid on the complainants' bonds or bills of credit, made the transaction usurious.

3d. The sum of five dollars required to be paid by the complainants per pound sterling, made the transaction usurious.

4th. The allowance of one per cent. to the vice president of the American Life Insurance and Trust Company, was a condition of the loan, and made the transaction usurious.

A fair compensation for examining the title is allowable; and if $250, or even $500, had been charged, it would not have been so disproportionate as to be properly regarded as a contrivance for something else. It was a part of the agreement for the loan, objected to, but the borrower's necessities compelled them to yield.

5th. The agreement to deliver and the subsequent actual payment, of the difference in value of the 1000 shares of the Dry Dock Company's stock amounting to $7334, made the transaction usurious.

This was thrown in as an inducement to the loan, was accepted and enforced, and made a part and condition of the transaction.

The stock was certain to go up on the resumption. The Trust Company's receipt on the post note given for the difference, shows it was their affair.

6th. So far as the complainants were concerned, the whole transaction was a *New York transaction*. They were to use the money here, and all their payments were by the terms of the agreement to be made here.

The expedient adopted to give it the aspect of a foreign transaction, was a mere device to cover the usury.

7th. The sacrifice of upwards of $12,000, to which the com-

plaınants were compelled to submit, to obtain the money on the certificates of deposit rendered, the transaction further usurious and void.

IV. The contract and bills of credit sought to be secured by the deed of trust, were usurious and void, and the deed itself was therefore void.

V. The whole transaction was made by a foreign corporation, in violation of the laws of this state against illegal banking, and was therefore void.

If the transaction be as contended by the defendants, a mere exchange of the certificates of deposit of the Trust Company, for the bonds or bills of credit of the Dry Dock Bank, then such exchange is in violation of the statute in relation to monied corporations, and such bonds or bills and the deed of trust are void. (1 R. S. 597, § 1, subd. 7.)

VI. If the transaction by the American Life Insurance and Trust Company, was a guaranty of the bonds or bills of credit, of the complainants, then the contract was in violation of the charter of the Trust Company and void.

VII. The Court of Chancery can alone give adequate relief, and the complainants are entitled to the relief prayed for.

Upon the law of the case, we refer to *Seneca County Bank* v. *Schermerhorn*, (1 Denio, 136 ;) *Dunham* v. *Dey*, (13 Johns. 40, and 16 Johns. 367 ;) *Seymour* v. *Strong*, (4 Hill, 255 ;) *Crane* v. *Hubbell*, (7 Paige, 413 ;) *Coster* v. *Dilworth*, (4 Cowen, 299 ;) Blydenburgh on Usury, 49 to 56, and the cases cited. On the other side, they will refer to *Ketchum* v. *Barber*, (4 Hill, 226,) which was negotiable paper already in market ; *Rapelye* v. *Anderson*, which was an existing security, sold ; and *Suydam* v. *Westfall*, (4 Hill, 211,) which was a commission of two and one-half per cent. for accepting, sustained on the custom of merchants.(a)

---

(a) With their points, the complainants submitted a statement, showing the excess reserved, (on their assumption,) by the Trust Company, over seven per cent. per annum, taking the pound sterling at its maximum legal value here, i. e. the heaviest sovereigns, $4 86 1-10.

The N. Y. Dry Dock Co. v. The American Life Insurance and Trust Co.

*Ogden Hoffman*, for all the defendants, except A. Crist.

I. The complainants are bound to prove the identical contract, which they set out and allege to be usurious.

This is a defence which receives little favor at law or in equi- ty. The strictest proof is required, and technical objections are upheld, to prevent triumphs over good morals and good faith. The defence here is most unjustifiable. The complainants, insolvent in 1838, applied for relief to this Trust Company, then supposed to be rich, and their certificates intended to be negotiated, are now with innocent holders abroad.

1. The bill alleges the contract to be a loan of money or securities, on the condition that the complainants should guaranty the purchase of stock by Mr. Duer, at a certain rate. This is denied by the answers, and disproved by Mr. D. and by Holmes ; and it is a fatal variance.

2. So the price at which the purchase was guarantied was seventy per cent., according to the bill. The complainants' witnesses disprove that price, and show it was at the market value.

By this statement, brought down to 15th July, 1845, assuming the Trust Company to have paid their certificates, principal and five per cent. interest, as they fell due, and computing interest at seven per cent., on each payment from the time it was made ; their advances and interest amounted to, . . . $320,960 86

And the Dry Dock Company's payments on their bills of credit, if made according to their tenor, to July 15th, 1845, when the last of them become due, would have been, . . . . . . 351,500 00

Excess, . . $30,539 14

To this the statement added as follows :

Reservation of one per cent. to the vice president, taken in one of the certificates of deposit for £500, due with five per cent. interest, on the 15th July, 1840, and interest thereon, . . . 3,524 22

Difference paid to the Trust Company on the 1000 shares of stock of the Dry Dock Company, $7,334 37

Interest to 15th July, 1845, . . . . . 3,646 61    10,980 98

Whole reservation in the contract, over and above seven per cent.,    $45,044 34

Sacrifice Dry Dock Co. was compelled to submit to, on the certificates of deposit of the Trust Co., $12,429 12

Interest to July 15, 1845, . . . . . 6,090 27    18,519 39

Whole reservation, over and above seven per cent.,    . . . $63,563 73

II. The transaction alleged as usurious, was a real exchange, or mutual sale of securities ; and was not, either in form or in substance, a loan of money or securities.

1. It was not a covert transaction, differing in its purpose from its apparent character.

2. It is essential to a loan, that there should be a return, either specifically of the same thing, or generically of a thing of the same kind. This was not a loan of credit ; but a sale or mutual exchange, and is not within the scope of the statute against usury.

The lender looks for funds to be returned to him. Here the transaction was complete and executed ; and when the bills of credit on one side, and the certificates of deposit on the other, were delivered, all privity of contract between the parties was at an end.

The securities might pass to the hands of others. There was no claim on either side for depreciation. It was like the sale of any chattel, or the exchange of an ox for a horse.

As to the payments being made here forty days in advance, the Trust Company became agents of the complainants to pay the amounts in London, in order to preserve their own credit as indorsers. Forty days was at that time the regular period for the transit of vessels across the Atlantic. This was purely a mercantile transaction, not a loan or a banker's. The complainants knew the Trust Company had no money to loan. If they supposed they were obtaining a loan, they were practising a stupendous fraud on the Trust Company, and on innocent holders in Europe, who should take their bills of credit in good faith.

III. If the transaction was a loan of credit, still the reservations did not render it usurious.

*a* 1. The reservation of seven per cent. interest on the Dry Dock bills, was no more than the legal interest on the amount of the certificates of The American Life Insurance and Trust Company.

2. If it were proper to look to the market value of the securities on each side, no difference is shown between them ; nor is it shown, that at the time of the transaction, the certificates were worth less than par, so as to constitute usury. (*Minturn* v.

*Farmers Loan and Trust Company*, before V. C. McCoun; *Dunham* v. *Dey*, before cited; *Bullock* v. *Boyd*, 1 Hoff. Ch. R. 298; *Stall* v. *Elde*, 4 Bing. 81.)

*b* 1. The stipulation for converting sterling into federal money, at five dollars for the pound sterling, and paying forty days before payment in England, was no more than a fair conversion of the different currencies, taking into view the time the Dry Dock bills had to run.

2. If the object of the parties were really exchange or money in England, such difference of value, by mutual agreement or adjustment, is not a subject of usury. The evidence is uncontradicted, that the whole arrangement had reference actually to a sale of exchange in the London market.

*c* 1. As a loan of credit, some reservation may be made by the lender for the loan; that reservation is lawful if it do not exceed a benefit of seven per cent. per annum, for the time of the credit loaned.

Here the certificates were loaned, one-half for one year, one-half for two years; making ten and one-half per cent. on the whole; the reservation was only four per cent.

2. It was part of the agreement, that the American Life Insurance and Trust Company should guaranty and remit the principal and interest of the Dry Dock bills; for this guaranty they were entitled to the four per cent.

3. The American Life Insurance and Trust Company, in the transaction, became liable to provide exchange in England, both for their own certificates, and for the Dry Dock Company's; the conversion of sterling into federal money, at five dollars to the pound sterling, on the Dry Dock Company bills, was a compensation of the remittance on one part only. The providing for their own certificates in England, was worth three per cent.; the remaining part of the four per cent. reserved, was less than a reasonable charge for the loan of credit, and service in such remittance.

Suppose both set of securities had been payable without interest, and the Trust Company had taken seven per cent. from the complainants, it would not have constituted usury.

The two per cent. difference in the rate of interest, and four per cent. commission, made only six in all; less than legal interest. But it was not six per cent. a year, for the bills of credit run seven or eight years before they all matured, while their whole advance was to be made in two years. Besides this, they incurred all the risk, liability and charges of remitting, which were then justly deemed very onerous. The country was in a perilous financial condition. There was no confidence; every thing was uncertain.

It is not true that the certificates were depreciated or that any sacrifice was expected. If they had been twenty per cent. below par, it would make no difference. The Trust Company were bound to pay their whole face. (*Bank of the United States* v. *Waggoner,* 9 Peters, 373, 378; *Andrews* v. *Pond,* 13 ibid. 65.)

IV. The advantages to Mr. Duer in the arrangement do not render it usurious, and cannot be taken into view.

1. The allowance of one per cent. for commission and counsel fee, was a matter of mutual agreement, not intended covertly as interest, or a reservation to the lender of any thing. (*Barretto* v. *Snowden,* 5 Wend. 135; *Little* v. *Barber,* 1 Hoff. Ch. R. 408.)

The court cannot say it was unreasonable between the parties. A charge of $25, on examining a title on a loan of $500, will be deemed reasonable. Yet it is five per cent. The responsibility is increased with the magnitude of the transaction. Here it was very large, the reputation of the counsel was involved, and he was responsible to every one who took one of the bills of credit, for the sufficiency of the title and the validity of the trust deed.

2. In relation to the stipulation respecting the purchase of stock, it not only was not for the benefit of the American Life Insurance and Trust Company, but when made, it was not understood to impart any loss to the Dry Dock Company. Its subsequently turning out otherwise, cannot make usury.

3. It is clear from the proof on both parts, that the allowance to Mr. Duer, and the guaranty of the stock purchase, were for the benefit of Mr. Duer exclusively of any interest therein directly or indirectly, on behalf of the American Life Insurance and Trust Company: it is therefore not within either the words

or the spirit of the statute of usury, which rests on a reservation or taking by the lender.

The whole thing was uncertain and contingent. The stock might rise to par, and it might fall to forty per cent. No usury can be founded upon it. (*Lloyd* v. *Scott*, 4 Peters, 227 ; *Fellows* v. *The American Life Insurance and Trust Company*, before Assistant Vice-Chancellor Sandford.)

If Mr. D. had been mercenary and scheming, he would have bought what stock he wanted, before answering the complainants' proposal.

V. The securities on each side, were made with the intent to be disposed of in England, and the title of the defendant Morrison, arose under such disposal in London. They are not subject to be impeached by the imputation of usury, unless it be shown to be so by the English law. (*Com. Kentucky* v. *Bassford*, 6 Hill, 526.)

VI. The bill should be dismissed with costs. The plea set up by the complainants is most unjust, and inequitable, to those who relieved them from their disastrous situation, in the time of their greatest need.

*Daniel Lord*, also for the defendants.

I never heard of a case which equalled this, in the atrocity of its injustice. These complainants in May, 1837, procured an injunction, restraining themselves from paying their own debts. In 1838, they deemed it advisable to resume payment, and preserve their very valuable charter. The requisite money was not to be had in this country, and they applied to the American Trust Company to aid them in raising it abroad, proposing at first that the latter should guaranty their obligations. If that course had been adopted, and the Trust Company had charged them seven per cent., it would have been sustained by law. Then it was suggested that the Trust Company should discount their bills receivable. If we had done that, at a discount of fifty per cent., it would have been valid ; but it would have taken the complainant's whole means.

Instead of this sacrifice, it was proposed that they should issue

244                CASES IN CHANCERY.

The N. Y. Dry Dock Co. v. The American Life Insurance and Trust Co.

their bills of credit, which are post note, promissory notes on interest.

Those who were negotiating were fair men, and had no thought of usury. Any other supposition would convict the complainants of a design to swindle the London purchasers; for the bills of credit, show on their face, that it was contemplated to sell them in London, and two witnesses prove that intention. And in the result, Mr. Morrison discounted them, and probably his funds paid the certificates of deposit on which the complainants received the money.

The court has a right to look at the moral aspect of the case, and in one of such gross dishonesty, to see that the complainants are clearly within the law. It always looks with odium, on the defence of usury, and no inference in its support is to be indulged.

The parties are confined to the bill, the only ground of which is that of an *usurious loan*. They cannot proceed on the basis of a sale, or an exchange, or on any defect or violation of the Trust Company's charter.

I. (The counsel then examined at large, the defendants' first point, respecting the variance between the bill and the evidence; citing *Smith* v. *Bush*, 8 Johns. 84; *Fulton Bank* v. *Beach*, 1 Paige, 434; *Vroom* v. *Ditmars*, 4 ibid. 532; *New Orleans Gas Company* v. *Dudley*, 8 ibid. 452; *Suydam* v. *Bartle*, 10 ibid. 94; *Tate* v. *Wiggins*, 3 T. R. 538. In conclusion, he proceeded;)

The allegation that the thousand shares were to be furnished at seventy per cent., is sworn in the bill to be a part of the agreement, and a condition annexed to it. They have sworn this averment into the very heart of the case, and they cannot get rid of it. It will be most righteous and poetic justice, if they should fail on such a ground as this variance.

Next there was no usury. There was no application for a loan. The bills of credit were intended as a deposit with the Trust Company, and on that the certificates were issued. The bills were valued as money, on the basis that they were equivalent to such money, or that so much could be raised out of them. On both sides it was expected the money would be raised in the Eng-

lish market. There was no device about the matter. It was just what the papers stated it to be, and all regarded it as legal then. Such a deposit was legal, and was similar to a deposit of bank notes, and an issue of certificates.

II. (See the point, ante, page 240.) The transaction was more properly a deposit than an exchange, but it comes to the same thing in law. If this were a purchase of bill for bill, there was no loan about it. When I lend my note or endorsement, I expect the borrower will pay it. If I exchange notes, and he is to make use of mine, but I am not to use his note; that is a loan. But where there is a mutual loan of notes, and each party expects to pay his own note; there is no loan. In the other case, neither could recover on the note he held. In the last, each can recover; both being valid business securities. Both parties are in want of money, and we exchange our notes. I sell his at six per cent. discount, and he sells mine at eight. There is no usury in that. So in this case, if there were a real business deposit of the bills of credit, and each party were to pay their own issue. I refer to *Rice* v. *Mather*, (3 Wend. 64;) and *Cameron* v. *Chappell*, (24 Wend. 94,) as to an exchange of notes.

The statute of usury only looks to a loan or forbearance; not to a sale or exchange. (*Rapalye* v. *Anderson*, 4 Hill, 472.) If this were not a loan, it is not within the statute. The honest purpose which could be accomplished, is to be looked to. The complainants may rather have intended violating the law against exchanges of notes and securities, than to swindle the community.

III. (See the point at large, *ante*, page 240.) Let us treat the transaction as *a loan*. What did we loan? Our certificates for £48,000, payable from six months to two years. Take one of ours for £1000, and one of their bills for £1000. I exchange my note for £1000, bearing interest at five per cent., for A.'s note for £1000, with seven per cent. Or suppose both were without any interest. Can I not take any compensation for that? Not even a six-pence? And if, at the end of five years, that were nine pence over seven per cent., would that be usury? It is settled here, that *commission* may be taken on an exchange of notes. If the transaction be considered as a loan of money, then a commission making more than seven per cent., makes it usu-

rious. If it be considered an exchange of notes, then such a charge is not usurious. *Ketchum* v. *Barber*, (4 Hill, 225,) proves that position, and is the law of this court. And see *Dunham* v. *Dey*, (2 J. C. R. 182;) *Fanning* v. *Dunham*, (5 ibid. 122;) 1 Hoff. Ch. R. 298. The statute has no limit short of seven per cent., and it never contemplated a loan of credit. Credit will not serve the terms of the law for payment.

If we lend certificates, with a view to go and buy them up, it is usury; but not if we exchange them.

Here both corporations had a right to issue the paper they did. The credit was a short one, and it was a real mercantile transaction. Was the reservation excessive? It was foreign money to be paid on both sides.

It cannot be said, that they took our certificates under par. The testimony does not prove the parties expected them to be so. They bore the English interest, five per cent. If worth par to them, was it not lawful for us to take seven per cent. for them? We are not liable if they chose to sell the certificates at five per cent. discount. This is so in any exchange of paper, and is so where the rate of interest on both sides is the same. We are to pay their full face; no matter how they sold.

If the price at which they sold is a test, then the value of their bills of credit is also a test. But it is not.

Now, as to the difference of four per cent. On an equation of payments, it makes about three per cent. per annum on the time our certificates had to run. If we add the one per cent. commission, it is still only four. The testimony shows it requires about three per cent. to take money in New York, and pay it in London. That is found in the five dollars to the pound sterling. What do we get for the three per cent. expense of remitting our payments to pay our certificates in London? We are to make both remittances. We are to defray the compensation of our broker there, for selling bills of exchange, paying out the money, &c., and we are to incur all the risk and liability. The contingencies of commerce come in view. Thus we have in this case a change in the value of gold coin by an act of Congress. Political events may affect the result. We are entitled to something for the use of our credit, the trouble and risk of sales, the

making of the payments in London, and the like. Is there any thing left of the four per cent. ?

The interest of money is based partly on the inconvenience to the lender, and partly on the risk of its never being returned. Say these considerations are equal, then three and one-half per cent. is a proper charge for the mere risk of not having the amount returned. The charge here is very moderate for the use of our credit only. See *Manice* v. *The New York Dry Dock Company*, (3 Edw. 148.)

IV. In respect of the counsel fee to Mr. Duer, and the contract for the shares of the complainants' stock.

. (The counsel examined these subjects at length, referring besides the cases cited by his associate, to *Holmes* v. *Williams*, 10 Paige, 326.)

V. The securities being made for disposal in England, and Mr. Morrison's title having originated there, they cannot be impeached for usury by the laws prevailing here. If the transaction were a loan, then it was such on both sides, and neither could maintain an action on the securities while they held them. No action could be brought upon them, until they were negotiated abroad. Therefore the English law governs the case. (*Chapman* v. *Robertson*, 6 Paige, 628.)

In conclusion, we trust the court will find the variance such as to render needless an investigation of the other points presented ; and thus will extinguish in the outset, this gross, atrocious, insolent iniquity.

*George Wood*, in reply.

The common subterfuges of the usurer in England, were a sale or a loan of credit. Our codifiers in framing the revised statutes, have specified these modes. The statute of usury is to be fairly and properly enforced. It is not to be construed, so as to eke out and aid the usurer, by catching at technical objections. The complainants are entitled to as much consideration, as any party coming for justice. Is this court going to evade the law ? The Chancellor in 3 Paige, was merely carrying out the prior rule in England, that the principal must be offered to obtain

relief in equity.   The legislature found that rank usury was
stalking through the land, and was rapidly increasing.   Then
came the act of 1837, abolishing entirely the English rule re-
ferred to.

I. In one view of this case, the Dry Dock Bank were issuing
circulating notes, payable abroad, and the Trust Company were
their agents to pay them there, being furnished with the money
here forty days in advance, and guarantying the notes to facili-
tate the operation.   This is the aspect of the case on the trust
deed.

In fact, as it is proved, it is one of gross usury.   There was
not a *direct* loan of money, nor an exchange of available paper.
The certificates on the one side, and the bills or bonds on the
other, were not previously available, but were concocted at the
time.   There are only two lights in which it can be viewed.   It
was either, 1. a loan of credit, secured by the bills and a mort-
gage ; or, 2. an exchange of available paper.

I apply to a capitalist for a loan.   He has not cash on hand,
but he has credit which is equivalent, and offers his notes at six
months or a year, on the security of my bond, and a trust deed.
That is a loan, his credit is loaned, my bond is a mere security
for his loan.   It is not a loan to him.   That is one case.   Sup-
pose then that two of us wanted money, and could use each
other's credit, and we exchange our notes, which in each others
hands is unavailable paper.

The question is, which was the transaction in this case ?   We
say it was the first ; a loan of credit to the complainants, and not
an exchange of unavailable paper.

The first element of inquiry is, what did the parties want, and
how did they come together ?   The Dry Dock Bank alone,
wanted to borrow.   They wanted to use their paper to get rid of
their embarrassments.   The Trust Company did not want to
borrow, they wanted no money, made no application.   Look at
their respective proceedings.   The bank had been about, to all
the other banks in the city, and in vain.   The *want* was all on
their part.   And what did they want ?   Not this wind, this chose
in action ; they wanted the substantial stuff.   Mr. Duer under-
stood that, and went with them to Holford, Brancker & Co., and

there they could see how that was to be obtained. True, the Trust Company had no money to lend, but they had credit; and Mr. D. satisfied the bank, before the transaction was entered into, that the company had such credit, and that it would be available as money to the bank.

The whole object of the bank was to raise money; not to circulate bills of credit, as held out in the trust deed. The character of the securities shows, that the loan was on one side only. The Trust Company gave mere personal security; their certificates. The bank gave the substantial security of land, and in a more efficient shape than a mortgage. If a mutual exchange of credit, there would have been no such course. They would have stood on the same platform, and exchanged personal security; or if there were a mortgage on one side, there would have been on both. It was a loan of credit to the bank, and calling it aught else, is a disguise and a cover.

2. This loan of credit by the Trust Company was usurious. If more than legal interest be reserved to the lender on a loan of credit, it is usury. In effect it is a loan of money. Unavailable credit is never sold. There is no such instance extant. Foreign bills of exchange are the subject of sale; otherwise of paper not available, and wherever that is used, it is a loan.

This is usurious, because more than seven per cent. was taken. It is said the Trust Company were to do so much, that the excess was for services, and all was merged. The first item of this sort, was the guaranty of the bank's bills of credit, and their sale and negotiation in London. The defendants' counsel himself, answered that, by his definition of interest; and the same is laid down in 2 Blackstone's Com.; the interest covered this risk. And these bills of credit became their property, when delivered to the Trust Company. If it were a loan, they took seven per cent., as a compensation for the use of the amount, and as an equivalent for the risk. It is a gross evasion of the usury law, for the lender, after getting these securities with seven per cent. interest, to take four, five, or ten per cent. to meet that risk. It is of no consequence to the borrower, whether the lender retains, or parts with the securities. But it is claimed, *if he part with*

*them*, to have besides seven per cent., which covers his risk, an additional sum.

The guaranty and the commission for it, are therefore to be laid out of the question.

*Now the compensation for remittance:* If they are entitled to it, it must be reasonable. These were terms imposed by the lender, which were not wanted by the borrower. The bank wanted to give a different kind of security. They did not want to pay in London, or to advance here forty days before hand. The court will watch such transactions with a jealous eye. (4 Bing. 81; 4 Hill, 211, 225.) On an exchange of paper, a party may take a fair compensation. So it was held in the Dunham cases, and there two and one-half per cent. was held usury. Why? because, if there were borrowing and lending, or terms imposed on the party, the court must see they were reasonable. In 4 Hill, 211, a commission of two and one-half per cent. was allowed; but it was paid to the party's own broker, not to the lender or his agent. So it is valid, on a sale of credit, if unconnected with a loan.

Here the difference between $4 86, and $5, to the pound sterling, pays for all these things. The $5 for £1, covers all, even if solid specie were transmitted. Then we have five per cent., payable on their certificates, and six per cent. reserved on our bonds, but payable here at seven. Then four per cent. is taken off from the whole principal, pell mell. Then one per cent. to Mr. Duer; $7300, and upwards on the thousand shares of stock; and a loss of over $12,000, on their certificates.

All these are to be taken into consideration, and show as gross a case of usury as could possibly be presented.

As to the stock, the testimony shows, what usually occurs, though not an express condition in nine cases out of ten, of usury. It is not required, yet is imposed. The Jew is very humble; he demands nothing; he gets offers. Mr. Holmes offered it in this case, and it was insisted on.

(The counsel then discussed the one per cent. paid to Mr. Duer.)

The transaction is grossly usurious, without these additions. To return to the main question. Suppose it a mutual exchange

of credits, in which each party desired the aid of the other. There the paper is not a subject of sale and transfer. I cannot make my note, and sell it; and so of an exchange by A. with B., for each other's note. Such paper is unavailable at the time; it is not an exchange of property. It is no more than a mutual loan of credit. A mutual loan of $1000, by each to the other, is absurd; but such mutual loans of credit, are of common occurrence. Where the credit is equal, it may be done for the indorsement by each other. If on mutual loan of credit, more than legal interest be taken, it is usury. (*Dunham* v. *Dey*, before cited.) On the other hand, if it were a sale of the paper of others, and previously available, five or ten per cent. discount might be taken. But here the defendants do not pretend the paper was the subject of property on either side, until it passed to others.

If there be any inequality in the value of the credit, the same principles apply, but the loan is only on one side. The cases cited from 3 Wendell, 24 Wendell, and 4 Hill, were not those of an exchange of paper previously unavailable. And 3 Edwards, 148, was foreign bills of exchange sold, the same as on a sale of a house. Besides, in that case there was a distinction taken upon the ground of an express agreement for a loan.

So if the defendants had established their position, that this was a mutual exchange of credits; it would be governed by the same rules. Our credit was at once available in their hands; and the court is to see that they get by the operation, only their funds and legal interest..

Suppose a needy borrower applying to a capitalist, who says he has no money; but will lend his credit. The borrower offers and consents, to take his note for $10,000, due in a year without interest, and to give his own note and a mortgage for $10,000, in one year, with seven per cent. interest. The capitalist thus lends a credit, that the borrower may get money. Well, the latter gets $10,000, less the 7 per cent. discount, say $9300. The capitalist is only to pay $9300, and a trifle for trouble, and receives at the end of the year, a little over 14 per cent. So where his note is given at 5 per cent. and the borrower's at 7. They say this is only two per cent. But the borrower gets only $9800, and pays $10,700. This is not so rank as the other, but it is usury.

The variance between the market and par value, in a loan of credit, where wanted as money, is an element of usury. The depreciation in the certificates was such an element. (*Fanning* v. *Dunham*, 5 J. C. R. 135; Plowden on Usury, 169, 171; 1 Bro. C. C. 149; Douglas, 708.) Sales of goods were then in vogue. Now, stocks, credits, bonds, bills &c., are the order of the day. As in 7 Paige, 587, where uncurrent bills were taken; and ibid. 636, bills of exchange taken at a premium. And see 1 Denio, 136.

As to this being a London transaction. The chancellor in 6 Paige, 634, draws the distinction, and puts this actual case. The whole was done here, the money was obtained here, and here we were required to pay it. The payment abroad was for the other party's convenience. It was a New York transaction throughout.

THE ASSISTANT VICE-CHANCELLOR.—The contract set forth in the bill may be thus stated:

The American Life Insurance and Trust Company agreed to loan to the Dry Dock Bank $250,000, on the following terms;

1. The banking company were to deliver to the Trust Company, their own bills of credit, or bonds for the $250,000, payable to the latter in sterling money, at five dollars to the pound, at a banker's in London, the interest to be paid half yearly, at six per cent. per annum, and the principal sum in instalments— £10,000 in July, 1842; £10,000 in July, 1843; £10,000 in July, 1844; and £20,000 in July, 1845. But instead of paying those bills of credit in London, the bank was to pay both interest and principal, to the Trust Company, in New York, (the interest at seven per cent.,) and such payments to be made in every instance, at least forty days previous to the time when they would fall due in London.

The whole sum of £50,000, with the interest, was to be secured upon the real estate of the bank, worth double the amount.

2. The bank agreed to allow a deduction of one per cent. from the nominal amount of the loan, which, as represented, was to enure to the private benefit of Mr. Duer, the vice president of the

Trust Company, and to be paid to him on the completion of the agreement.

3. It was agreed that the bank should guaranty to Mr. Duer, that upon the consummation of the contract, he might and could purchase in the market, the stock of the bank to the amount of one thousand shares, at the rate of seventy per cent. of the par value of the same.

4. Instead of loaning to the bank the entire sum of $250,000, it was agreed that the nominal amount should be reduced four per cent. ; and instead of money, that the bank should take and accept the Trust Company's certificates, or obligations for such reduced amount, (being £48,000, or $240,000,) payable in London, with interest at five per cent.—part in 1839, and the residue in 1840.

The first inquiry in the case is, whether the complainants have proved the contract, as it is stated in their bill ?

Without adverting here to the point that there was no loan, I may say, that the terms of the agreement, which I have designated as the first and fourth, are not questioned by the defendants.

But their counsel insisted, with great force of argument, that in respect of the others, and especially the third, there was a fatal variance between the bill and the evidence.

*First.* As to the one per cent. agreed to be allowed to Mr. Duer. It is said that this, in the bill, is set forth as being exclusively a price or premium, for forbearance—whereas the proof, in its worst aspect, shows that a part of the amount was to be paid to Mr. Duer, as a counsel fee for examining the title of the lands conveyed as a security.

I think this objection is not well founded. The charge in the bill is very general, and does not state the one per cent. to have been for forbearance only ; it alleges that one per cent. of the amount of the loan was to be paid to Mr. Duer, and that as it was represented, the same was to enure to his benefit. All the testimony on the subject appears to sustain this allegation. Whether, as thus stated, it establishes usury, is another question, which I need not discuss in this place.

*Second.* In respect to the guaranty to Mr. Duer, of the purchase of the stock at seventy per cent., the variance insisted on

is two-fold, viz.: that this agreement was not a term or condition of the loan; and if it were, the proof shows an agreement at seventy-five per cent., instead of seventy per cent.

In regard to its being a term or condition of the loan or transaction, the circumstances leave no room for doubt. If there were no testimony further than the cotemporary agreement, the inference would be irresistible that it was a branch of the contract for the $250,000. I do not believe that Mr. Duer in express terms annexed it as a condition, and he certainly did not propose it. But when Mr. Holmes proposed it, it was at once acceded to, and Mr. Stebbins understood distinctly, that the transaction could not be completed without it.

Neither banks nor business men are in the habit of offering such bargains without an equivalent. It is no answer to the argument to say, that the committee on the part of the bank did not expect to lose much, because they then supposed that they controlled the stock. If they had expected no loss, a great profit was certain to ensue on the bank's resuming specie payments; and the committee were no more likely to throw this away, than they were voluntarily to incur a loss. No one can imagine, upon the undisputed facts in the case, that the bank would have entered into the engagement relative to the 1000 shares of stock, except in connection with the loan, and to insure its completion.

In the case of *Clague & al.* v. *Their Creditors*, (2 Martin's Louis. R. 114,) where there was no direct proof that the usurious advantages obtained by the lender collateral to the loan, were made a condition, the court held that the internal evidence afforded by the nature of the transaction, was sufficient to show who connected those advantages with it.

Next, as to the variance in the rate at which the stock was guarantied. The charge in the bill is distinct, that the rate was seventy per cent., and it is not relieved from that precise rate by any subsequent allegation, either in the bill or the schedules annexed.

The testimony of Mr. Holmes comes very near sustaining it, because he says the agreement was a little below the market price; three, four or five per cent. below it; and the market price is shown to have been from seventy-three to seventy-three and

one-half per cent. Mr. Duer, however, is entirely explicit. He testifies that the price agreed upon was seventy per cent.; and in this he is the more positive, because, as he says, when the affair was settled, he consented to pay several per cent. more than the price at which it was offered to him, and did pay more than seventy-five per cent.

It is proved by the certificate or obligation given for the difference, that the settlement was made at about seventy-five and one-half per cent. This, with what Mr. Holmes recollects, convinces me that the agreement for the stock was at the rate of seventy per cent.. In this respect, therefore, there is no variance between the allegation and the proof.

A further variance was insisted upon at the hearing, (although it is not found in the defendants written points,) in consequence of the charge in the bill, that the loss which the bank sustained in cashing the Trust Company's certificates, was contemplated by the contracting parties. It is claimed that the bill makes this expected loss one of the terms of the agreement, and that there is no proof that such loss was expected.

The charge on this subject is not made in connection with the statement of the contract, but follows the charge that the certificates were issued by the Trust Company in pursuance of the contract previously set forth. It is plain, therefore, that it was not intended to be set forth as one of the terms of that contract. It is true, the bill, in summing up the loss incurred, includes the discount upon the certificates, and alleges that the result thus shown, was certain and well known when the loan was contracted, and was usuriously exacted by the Trust Company.

But this general charge of usury, including three exactions which had previously been stated distinctly as being usurious, and as positive terms of the contract, can scarcely be construed into a statement that it was a stipulation in the contract that the bank should sell the certificates at a discount, or that such discount was an exaction for the Trust Company's benefit.

If the sacrifice on the certificates had been seriously argued as constituting usury in this case, it would be a sufficient answer to the argument that the bill does not set it up as forming a part of the agreement between the parties.

I do not discover any variance between the complainants allegations and their proofs, in regard to the contract in question.

The next inquiry is, was the transaction a loan; or was it a real exchange or mutual sale of securities, as it is denominated by the defendants?

In determining this point, the court must be guided by the nature of the transaction, and the objects of the parties in negotiating it, so far as those objects were mutually understood. The words used in such negotiations, do not always signify what the parties really intend. (*Barker* v. *Van Sommer*, 1 Bro. Ch. C. 149.)

The object of the Dry Dock Bank, was to resume specie payments, and save their valuable corporate franchises from forfeiture. To this end they wanted money, and nothing but money would answer the exigency. Their views and their necessities were fully known to the Trust Company. On the other hand, the Trust Company were strong in their capital and in their credit, and were fully conscious of both. They stood in no need of money, and had no occasion for an exchange of securities.

When a merchant, who is in want of money, applies to a capitalist for his note payable at a future day, and offers security by his own note, with an indorser, and the respective notes are executed accordingly, the transaction is a loan. When two merchants, who are both desirous of raising money, exchange their own notes, to be used for that purpose, with third persons, it constitutes an exchange of securities merely:—its effect is the same as if each had used his own note with the other's indorsement.

In this case, the Trust Company was the capitalist, and the bank was the merchant needing money, and offering real estate security for its re-payment.

From the relative situation of the parties, as mutually known; the transaction bears the aspect of a loan, and not an exchange of paper. The testimony of the witnesses on both sides establishes the fact, that the application of the bank was for a loan of the credit of the Trust Company, and that there was no proposition for an exchange of credits. The bank solicited a loan, not

of cash, because it was known that the Trust Company were not then in funds ; but of paper credits, which, as the Trust Company pointed out, would produce cash to the bank. The Trust Company were to give no collateral security for their paper ; the bank was to give security on real estate, unquestionably worth more than the loan ; and finally, each of the bills of credit which the Trust Company received from the bank, recites that it is a part of a "*loan*" of £50,000.

Another argument, if any were needed, to show that this cannot be deemed an exchange of paper, is found in the statute which forbade the bank from making such exchange. While struggling to borrow, in order to avoid a forfeiture, the bank would not deliberately incur one, by violating this statute.

Next, as to the argument that the transaction was a sale of the paper of the bank, for that of the Trust Company.

This is but another phase of the idea of an exchange of paper, and is open to the same observations. The defect in the argument is, that neither a sale or an exchange, was the subject matter of the contract. The bank applied for and obtained a loan, offering and giving, as borrowers are compelled to do, satisfactory security. The Trust Company assented to the application, and made the loan. The form which the Trust Company thought it expedient to have the securities assume, when executed by the bank, cannot disguise or alter the nature of the transaction. There was no sale about it. The bank had lands and bills receivable, which were legitimate subjects of sale ; but they did not want to sell them. Their own promises to pay, were not proper objects of sale, and were not offered for sale. The Trust Company were known lenders of money, but having none at the moment, they loaned their credit, in the shape of certificates of deposit, payable at short dates. They did not sell their certificates to the bank for the price secured by the deed of trust.

A merchant wanting $1,000 from a bank, goes to the bank with his own note at six months, for $1,035, properly endorsed, and applies for a loan of a post note of the bank at three months, and the bank issues such a post note for $1000, and receives the note of the merchant.

Could this with any propriety be called a sale by the bank, of

its post note to the merchant? Assuredly not. In this point of view, the expectation of the Trust Company, that they would have to guaranty the bills of credit of the Dry Dock Bank, is not at all material. That expectation had reference solely to the contingency, that in order to meet their own certificates, the Trust Company might have to obtain a loan on those bills of credit or otherwise. It does not affect the nature of the original contract, or alter its obvious character. The capitalist who lends his credit for a short time, is liable to be disappointed in the receipt of funds, and thus be driven to use his credit, to meet the paper which he issued. He may use such credit, either by drawing his own note, or by endorsing the paper which he received on making the loan. Neither the contingency, or the mode of obviating it, has any bearing on the nature of the original loan.

It is perfectly clear to my mind, that the transaction between these corporations, was a loan of its credit by the one, on the security of the real estate owned by the other.

The question is then presented, was the loan usurious? By the law of this state, every contract is void by which there is reserved or agreed to be taken, any greater sum or value than seven dollars on one hundred dollars for a year, (or in that proportion for a different period,) for the loan or forbearance of any money, goods or things in action. (1 Rev. Stat. 771, § 1 to 5; Laws of 1837, Ch. 430.)

It was contended by the defendants, that a loan of credit is not within the statute; but I cannot assent to the argument. To apply it to this case, the Trust Company loaned to the Dry Dock Bank, their certificates of deposit, payable at a future day. These were things in action, and within the letter of the statute. In effect, it was a loan of money, to be advanced at a future period. Any other construction of the law would nullify it at once, for every lender would refuse to loan money, and substitute a loan of his notes at short dates.

If there be *a loan*, it is void, provided more than seven per cent. interest is reserved—whether the loan be made in goods, in credits, or in cash.

In *Ketchum* v. *Barber*, (4 Hill's R. 225,) which was cited by the defendants, the transaction was upheld, (although by a bare

majority of the judges, both in the supreme court, and in the court for the correction of errors,) on the sole ground that there was no loan whatever by Ketchum to the prior parties on the note. The loan was made by the Union Bank, and the majority of the judges in each court, held that Ketchum merely sold his credit by way of guaranty, or indorsement, as a surety. The result of the decisions, in *Suydam* v. *Westfall*, (4 Hill's R. 211,) and *Suydam* v. *Bartle*, (10 Paige, 94,) as I understand them, is, that an agreement with a commission merchant, who accepts bills to be met with shipments of produce, to pay him two and a half per cent. on advances he may be required to make on the drawer's failing to send sufficient produce, is not of itself usurious ; but it is to be considered with other facts, upon the question whether the contract is a cover for an usurious premium, or merely provides compensation for services.

The case of *Stoveld* v. *Eade*, (4 Bing. 81,) was also cited. The court there held that there was no loan, nor any application for a loan. The report of the decision is not precisely intelligible. I do not perceive what the amount of the commission, or its being under or over five per cent., had to do with determining whether the transaction was a loan or an accommodation exchange.

The case of *Dunham* v. *Dey*, (13 Johns. 40,) and *Dunham* v. *Gould*, (16 ibid. 574,) in our own courts, are entirely decisive, that the loan of credit in this case is within the provisions of the statute against usury.

In this connection, I may as well consider the point urged, that on a loan of credit, the lender, exclusive of interest may charge a commission not exceeding seven per cent. per annum, and that the interest, which he reserved on the borrower's securities, is only an equivalent for that which he is to pay on the paper he issues or lends. The case of *Dunham* v. *Dey*, above cited, was decided on what I conceive to be the true ground, that a loan, whether of cash or credit, is to be subjected to the same rule.

That decision was affirmed in *Dunham* v. *Gould;* and although the chancellor dwelt upon the point, that the commission exceeded the lawful interest, (both sets of notes being payable

without interest,) it does not appear that the court of errors discarded the principle adopted in the court below.

In *Fanning* v. *Dunham*, (5 J. C. R. 122,) which was relied upon in this branch of the case, Chancellor Kent did, indeed, hold the securities to be usurious, because the commission exceeded the legal interest for the time the notes had to run, and thus indirectly gave his opinion that they would not have been usurious, if the commission had fallen short of the interest. But he has never decided the latter proposition, so far as I can discover. And in view of the judgment of the supreme court in *Dunham* v. *Dey*, (13 Johns. 40,) if the weight of authority is not clearly against it, the point is at least untrammeled by any binding decision.

The first suggestion that occurs to me is, that if a charge for *commission* be tolerated at all, where there is a loan of credit, it must be regulated by a variety of circumstances in different cases, and that there can be no propriety in limiting it to the legal rate of interest. For example—one lends his note for thirty days only, in a time of great commercial embarrassment, when the chance of being disappointed by the borrower, (who gives his note at the same date,) is very great; and he charges a commission of one per cent. No merchant would say that this was not a reasonable, indeed, an inadequate commission. Yet, under the rule in *Fanning* v. *Dunham*, it would be usury, because it exceeded the interest for thirty days. Now take another illustration: A. lends to B., his notes payable with interest at two years, and B. secures him by a bond and mortgage, payable in three years with interest, and as a commission, A. deducts twelve per cent. from the amount of B.'s mortgage. This strikes the mind at once as being grossly exorbitant, yet it is less than the lawful interest for the two years, and still less in proportion for the three years.

The rate of interest allowed by law, I am confident, can furnish no criterion for the regulation of a commission; and I think that whenever a commission is charged by the lender, unless it be for some real service, distinct from the loan itself, as was the fact in *Hammett* v. *Yea*, (1 B. & P. 144,) and *Cayuga County Bank* v. *Hunt*, (2 Hill's R. 635,) and then be a moderate and

reasonable charge, it must infallibly be referred to the use of the money or credit loaned.

To test the matter further in loans of credit. Suppose A. applies to B., a lender of money, for a loan of B.'s note of $1000, for one year; obtains such a note, not bearing interest, and gives his own note with sureties, payable at a year, with interest—then A., to effect his object, must sell B.'s note and turn it into money. He will be fortunate if he can find a broker who will discount it at seven per cent. If he procure it to be cashed at that rate, he will receive $930, as his actual loan. At the end of the year, he will pay $1070; or $140 for the use of $930 for a year. This is more than fifteen per cent. Yet on the argument urged by the defendants, it would be legal. Let us see how B., the lender, would come out of such an operation. If A. paid his note when due, B. would take up his own note with the money thus furnished, and receive $70 from A., without advancing a farthing. If A. failed to pay his note, and B. were compelled to collect it by suit, the collection might occupy six months. In that event, B. would have to advance the $1000 at the end of the year to pay his own note, and he would continue in advance six months. At the end of that time he would receive from A. $1105, which would be $105 for the six months' advance of $1000.

The more probable course in the case put, would be for B. to discount his own note, through a friendly broker, with whom he would make a reciprocal arrangement, so that he would in fact advance the $930 at the outset, and thus receive the fifteen per cent. for its use for one year.

There are so many modes in which this system might be pursued, and they are so obvious, that it is a waste of time to trace them farther. (See *Reed* v. *Smith*, 9 Cowen, 647.)

Suffice it to say, that if it be once settled as law, that a man may lend his own notes or his bonds on time, without interest, taking in return securities payable with interest, or may lend his own paper payable with interest, and in return take securities payable with interest, and include a commission for his risk and trouble, not exceeding seven per cent. per annum; the whole

business of making loans will be transacted in this mode, and the statute against usury will be made a dead letter.

These observations are somewhat in advance of the order in which I proposed to treat this case; but they are so connected with the consideration of loans of credit in respect of the statute, that it was more convenient to dispose of the whole subject at once.

I will next consider the facts which the complainants allege in their bill, constituted usury.

Their first point is made upon the deduction by the Trust Company of the sum of $10,000 from the loan of $250,000. The complainants gave their bills of credit secured by their real estate, for £50,000, which bills they were to pay in New York at the rate of five dollars for every pound sterling. In other words, they were bound to pay to the Trust Company $250,000, with interest half-yearly at seven per cent.

The credit which the latter loaned to the bank was the sum of £48,000 in certificates, payable in London, and bearing five per cent. interest. At the same rate of five dollars to the pound, these certificates amounted to $240,000.

This deduction of $10,000, or four per cent. on the sum loaned, is defended as being a compensation for the Trust Company's guaranty of the bills of credit issued to them by the bank, and for the trouble, expenses and extraordinary risks, assumed by the company in twice remitting to London, and paying there the amount of $240,000, or $250,000; and the defendants urge that the understanding of the parties was explicit, that the Trust Company were to use the bills of credit of the bank, in order to raise money in London, and hence the necessity of the guaranty and the double remittance.

I am sorry to say, that I cannot give to these positions the force which was claimed for them by the learned and eloquent counsel for the defendants.

*First*, as to the guaranty. The whole point is, that the Trust Company, when their certificates for the £48,000 fell due, might be obliged to borrow the money to meet them, and instead of simply giving their own obligation to the lender, would transfer

the bills of credit of the Dry Dock Bank, or would sell them outright.

The lender or purchaser, it was supposed, would require the added liability of the Trust Company upon the bills of credit. Assuming this to have been the mutual expectation of the parties, I am at a loss to perceive what new risk the Trust Company incurred by the operation. In no event could they lose the $250,000 more than once, and they were subjected to that risk while they held the bills of credit, precisely as they would be, after they had transferred them with their guaranty. The real estate of the bank was conveyed in trust, for the express purpose of guarding against the risk, and it was believed to provide for it effectually. The only further consequence, which the Trust Company would incur by such a guaranty, would be that they might be compelled once to advance the $250,000. Whereas, if the Trust Company had sold the bills of credit to the amount of $240,000, (or borrowed that sum on a pledge of the same,) before their own certificates fell due, and the Dry Dock Bank had punctually paid the bills as stipulated in the deed of trust, the Trust Company never would have advanced a dollar.

This was unquestionably the expectation of the Trust Company, if, as it is insisted, the original design was to use the complainants' bills of credit in London. The case differs in no respect from that of a money lender, who, instead of cash, lends his note at a year, and takes from the borrower a note at five years, secured by a mortgage; and who, at the end of the year, in order to provide funds to meet his own note, finds it necessary or convenient to use the mortgage and note of the borrower, and indorses the latter for that purpose. Suppose that on lending his note, he had avowed his belief that at the end of the year, he would have to indorse the borrower's note, and transfer his mortgage to take up his own note, and had thereupon required the borrower to pay him four per cent. on the sum loaned, as a compensation for his risk and trouble growing out of such indorsement. No court in this state could uphold such an exaction.

I can find no color for reserving the $10,000 on this loan, in the contemplated guaranty of the bills of credit.

Then, in regard to the double remittance from New York to London, and its extraordinary hazards.

To illustrate the claim made upon this ground, I will follow out the result, which in its various contingencies, might have ensued from this transaction :

*First.* In the event that the Trust Company had paid their certificates in London, by advancing the £48,000, retaining the bills of credit of the Dry Dock Bank. Then there would be no remittance to London on account of the bills of credit. Those would be paid here, as provided in the trust deed, and being held by the Trust Company would thereupon be discharged. The Trust Company would remit £48,000 to London to meet their certificates. For the whole expense of this remittance and payment, they were fully indemnified by the obligation of the Dry Dock Bank to pay to them here $240,000, or five dollars for every pound sterling—a rate which was doubtless fixed upon as such indemnity.

The proof is abundant, that the difference between five dollars to the pound, and $4 86-100ths, the legal value of the sovereign or pound sterling in 1838, would pay all the expenses incident to remittance and payment, either in bills of exchange or in gold coin. This difference sufficed to cover guaranty in a remittance of bills, and insurance, if specie were shipped. The $240,000 would, therefore, make good the remittance and payment of the £48,000, with its attendant hazard.

Thus there is no double remittance in the first contingency which I have traced, and no pretence for the charge of $10,000.

Next, I will take the mode alleged to have been intended by the parties :

The Trust Company would send to London the bills of credit guarantied by them, (either with or without a transfer of the charge on real estate, to which the bills refer,) and would raise £48,000 by a pledge, or a sale of those bills. With this £48,000 raised in London, they would pay their certificates as they matured. The funds being already in London, no remittance from New York, would be requisite to meet those certificates.

If, however, the Dry Dock Bank should fail to pay in New York, the amount of their bills of credit forty days before they

fell due, so as to put the Trust Company in funds to take up such bills in London when they became due, the Trust Company would necessarily make an advance and a remittance to London for that purpose. But for this remittance, they would have the five dollars to the pound, or $240,000, which they could collect of the bank in New York, and which covers the whole charge.

It may be urged that the Trust Company, on selling the bills of credit in London, should not be compelled to keep the proceeds there unproductive, until their certificates became due ; for this might subject them to a great loss of interest, if they availed themselves of the most favorable time for making a sale. I do not think that any such loss need to have ensued in the event supposed, or could have been contemplated by the parties. The obvious course of the Trust Company would be to sell exchange in New York, drawn against the proceeds of the bills of credit, and when their certificates matured, to buy exchange on London in the same market, and remit to meet them. The profit on the sale, would usually balance the expenses of the purchase. The testimony of the eminent bankers who were examined as witnesses, shows that the fluctuation in the value of exchange on London is not so great, but that five dollars for a pound sterling, furnishes a sufficient margin to cover any supposable difference in price, between the times of such sale and purchase.

A suspension of specie payments was adverted to ; as to which it suffices to say, it would not suspend the contract, or make it payable in aught but gold and silver. There is no double remittance to be found in this way of carrying out the operation.

*Lastly.* I will suppose that the Trust Company were to make a remittance in the first instance, from their own funds, and thus pay their certificates. This, at five dollars to the pound, would require them to advance $240,000, in New York. Then I will suppose that they subsequently sold in London, and guarantied £48,000 of the Dry Dock Bank bills of credit. The proceeds drawn against from New York, would reimburse the expenses of the first remittance.

Then, if they were afterwards compelled to advance to take up the bank's bills of credit, the expenses of that remittance are pro-

vided for in those bills, in the payment of five dollars in New York, for every pound advanced or paid in London.

The result is, that although in the case last put, the Trust Company might have to remit the £48,000 to London twice, yet the charges of the first remittance would be reimbursed by the sale or loan effected, upon the bills of credit of the bank, (without which sale or loan the second remittance could never be requisite,) and the charges of the second remittance would be fully covered by the $240,000 payable in New York, for the £48,000 remitted.

I have said nothing of the contingency that the Trust Company might be unable to realize in London £48,000, on that amount of the bills of credit of the bank, even with their guaranty. It is not set up as forming any part of the inducement or consideration for the $10,000 reserved; and it would be inconsistent with the ground taken, that the certificates of the Trust Company, bearing interest at five per cent. were worth par in London. Their naked obligations could not be worth more than these bills of credit, fully secured by real estate in the city of New York, and guarantied by the Trust Company.

In no point of view, have I been able to discover a reasonable ground for this deduction of $10,000, in the loan in question. It must, therefore, be regarded as a premium or compensation for making the loan, and it being in addition to the reservation of seven per cent. interest, our law declares it to be usurious.

It is unnecessary for me, after this conclusion, to examine any of the other facts which are alleged as constituting usury.

The defendant Morrison insists, that the securities are not subject to be impeached by the imputation of usury, unless it be shown that they are usurious by the English law; because they were made with the intent to dispose of them in England, and his title arose under such a disposal made in London. I think the law is clearly otherwise, and that the securities must stand or fall by the laws of the state of New York. They were executed and delivered, and the loan was made in this city; here is the real estate by which the debt is secured, and the debt is payable here.

The bills of credit, though expressed to be payable in Lon-

The N. Y. Dry Dock Co. v. The American Life Insurance and Trust Co.

don, refer to the charge upon the real estate, and thus gave notice to Mr. Morrison, of the trust deed, and of its requirement that the Dry Dock Bank should make payment in New York. It is, in every sense, a New York contract, and would be so adjudged in the courts at Westminster Hall.

The views of the chancellor in *Chapman* v. *Robertson*, (6 Paige, 627, 632,) fully sustain this construction of the contract.

My conclusion is, that the bills of credit are usurious, and the trust deed by which they were secured, is void.

The complainants are entitled to a decree accordingly.

I have made no allusion to the policy of the law which leads to such a severe loss of property, nor to the character of the act by which it is enforced; for neither can be permitted to influence my judgment in the slightest degree. Whether the law be politic and just, or barbarous and oppressive, it is no part of my province to determine.

As the law of the land, I am sworn to administer it, and am bound to give effect to it fully. It is not to be treated with disfavor, or evaded by the courts.

So as to the character of the proceeding, by which this bank attempts to elude the payment of a very large loan, received at a time of peculiar and extreme necessity. However I may regard its immorality and its flagrant injustice to the extent of the actual loan, it is my duty to grant the complainants a decree, if they have brought themselves within the provisions of the statute against usury. The legislature, in 1837, deemed it expedient to require the court of chancery to take cognizance of these cases, without the preliminary step which the court had always before imposed on the party seeking relief from usury, the payment or offer of the sum actually loaned with the legal interest.

When a case is brought plainly within the provisions of the usury laws, and is within the jurisdiction of the court, the contract must be avoided, without any restriction or imposition of terms.

Decree accordingly.